***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Baddour and the briefs and arguments of the parties. The appealing party has shown good grounds to reconsider the evidence. Accordingly, the Full Commission reverses the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 *********** *Page 2 
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction of the parties and of the subject matter.
2. All parties are subject to and bound by the North Carolina Workers' Compensation Act.
3. All parties have been properly designated and there is no question as to misjoinder or nonjoinder of parties.
4. The carrier on the risk for defendant-employer in I.C. No. 395486 was St. Paul Fire and Marine Insurance Company.
5. The carrier on the risk for defendant-employer in I.C. No. 665675 was American Home Assurance Company, and Broadspire was the processing agent.
6. Plaintiff sustained a compensable injury to his right knee on January 10, 2004 when he fell off a ladder and twisted his right knee in I.C. No. 395486.
7. Plaintiff underwent surgeries to his right knee on January 30, 2004, June 17, 2004, and January 9, 2006.
8. Plaintiff returned to work with defendant-employer on or about March 9, 2006 as a utility man.
9. Plaintiff alleges to have sustained a compensable injury to his right ankle, right knee, right wrist and right shoulder on October 2, 2006 when he was walking out of a modular home under production and stepped down a steep step while carrying a box of fixtures when his right knee gave way and he fell, striking the right side of his body on the ground. Plaintiff contends that the *Page 3 
October 2, 2006 fall resulted from a give way response to the right knee previously injured on January 10, 2004 in I.C. No. 395486 and/or from stepping down a steep step while carrying a box of fixtures in I.C. No. 665675. Defendants deny plaintiff's allegations.
10. Defendants in I.C. No. 395486 have denied this claim based on its contention that they were not the carrier of record for the October 2, 2006 date of injury, and plaintiff's injury did not proximately result from his injury on January 10, 2004.
11. Defendants in I.C. No. 665675 have made no response to plaintiff's Form 18 (the evidence of record shows that a Form 61 was filed in response to plaintiff's Form 18).
12. An employment relationship existed between plaintiff and defendant-employer on January 10, 2004.
13. An employment relationship existed between plaintiff and defendant-employer on October 2, 2006.
14. Plaintiff's average weekly wage is $571.31, yielding a compensation rate of $380.89 in I.C. No. 395486. Plaintiff's average weekly wage in I.C. No. 665675 is subject to verification by a Form 22 wage chart.
15. Plaintiff has alleged that he has not worked since October 2, 2006.
16. On November 27, 2006, defendant St. Paul Fire and Marine Insurance Company authorized an MRI of plaintiff's right knee which was without prejudice, and by letter dated November 29, 2006, plaintiff accepted the same.
17. Executive Secretary Tracey H. Weaver ordered I.C. No. 395486 and I.C. No. 665675 consolidated for the hearings and all further proceedings on June 26, 2007.
18. An MRI taken after the October 2, 2006 fall reflected a deranged right knee requiring surgery. *Page 4 
19. Surgery for the right knee has not been authorized by either defendant-carrier.
 *********** EXHIBITS
The Pre-Trial Agreement was marked as Stipulated Exhibit 1. In addition, the following Plaintiff's Exhibits were admitted into evidence by stipulation:
1. Exhibit A-I.C. Forms
2. Exhibit B-Medical Records
3. Exhibit C-Correspondence
4. Exhibit D-Form 28U
5. Exhibit E-March 16, 2007 Administrative Order
6. Exhibit F-Plaintiff's Motion for Reconsideration
7. Exhibit G-June 11, 2007 Administrative Order
8. Exhibit H-Plaintiff's Request for Expedited Hearing
9. Exhibit I-Responses of Defendant-employer and St. Paul to Plaintiff's First Set of Interrogatories and Request for Production of Documents
10. Exhibit J-Plaintiff's Reponses to Interrogatories and Request for Production of Documents of Defendant-employer and St. Paul
11. Exhibit K-Personnel File through 2005
12. Exhibit L-Incident Reports
13. Exhibit M-Termination Report
14. Subsequent to the evidentiary hearing, defendant-carrier American Home Assurance submitted a Form 22 with supporting documentation.
 *********** *Page 5 
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the evidentiary hearing, plaintiff was thirty-three years old. Plaintiff was hired by defendant-employer Palm Harbor Homes, Inc. d/b/a Masterpiece Housing on March 11, 1994. Defendant-employer builds and sells manufactured homes.
2. The manufactured homes produced by defendant-employer are built inside of a large warehouse, and are moved around the warehouse on mechanical pushers. The mechanical pushers are floor joists covered with decking that sits on wheels ranging from eight (8) to ten (10) inches in diameter.
3. Plaintiff fell off a ladder and injured his right knee while working for defendant-employer on January 10, 2004.
4. On January 19, 2004, plaintiff presented to Dr. Joseph Zucker at Albemarle Orthopedic Services for evaluation of his right knee.
5. An MRI of plaintiff's right knee was performed at Cabarrus Diagnostic Imaging on January 21, 2004, which revealed a complete disruption of the anterior cruciate ligament, an extensive tear of the medial meniscus, and a strain of the lateral ligamentous complex.
6. On January 31, 2004, plaintiff underwent a medial meniscal repair, a cruciate ligament reconstruction with a bone-tendon-bone allograft, and a partial debridement of the tear of the lateral meniscus at Stanley Memorial Hospital.
7. Defendant-carrier St. Paul Fire and Marine Insurance Company paid plaintiff's medical expenses and resulting indemnity compensation related to this surgery. *Page 6 
8. After the January 31, 2004 right knee surgery, plaintiff was subsequently released back to work without restrictions by Dr. Zucker.
9. Plaintiff continued to have difficulty with his right knee including pain, swelling, and episodes of the knee giving way.
10. On May 18, 2004, plaintiff presented to Dr. Joseph Zucker at Albemarle Orthopedic Services and reported that at work the previous week he felt a popping sensation in his right knee, and that his right knee had developed some swelling.
11. An MRI of plaintiff's right knee taken on May 24, 2004 at Cabarrus Diagnostic Imaging revealed a tear of the posterior horn of the medial meniscus and a small tear of the posterior horn of the lateral meniscus.
12. On June 17, 2004, plaintiff presented to Stanley Memorial Hospital and underwent a right knee arthroscopy to repair his torn meniscus.
13. Defendant-carrier St. Paul Fire and Marine Insurance Company paid plaintiff's medical expenses and resulting indemnity compensation related to this second surgery.
14. Plaintiff returned to work with the utility department of defendant-employer within approximately one month following his second right knee surgery.
15. Plaintiff continued to suffer from problems with his right knee, including pain and swelling.
16. On June 9, 2005, plaintiff presented to Physician's Assistant Scott Webster and Dr. Glenn Perry for evaluation of right knee pain that related back to the January 10, 2004 injury. Plaintiff reported having recently suffered a significant right knee buckling episode while walking on a flat surface. *Page 7 
17. An MRI of plaintiff's right knee taken on June 28, 2005 at Northeast Medical Center revealed that plaintiff's anterior cruciate ligament was intact but that there was a recurrent tear of the medial meniscus.
18. Plaintiff presented to Dr. Perry at HealthSouth Surgery Center of Charlotte on January 9, 2006 and underwent a third right knee surgery.
19. Plaintiff returned to Dr. Perry on March 8, 2006, at which time he expressed satisfaction with his surgical result. Plaintiff reported occasional pain, but was otherwise doing well. Dr. Perry examined plaintiff's knee for pain, swelling, and looseness. There were no abnormal findings at all. Plaintiff did not complain of giving way weakness or instability. Dr. Perry was satisfied that plaintiff did not have a ruptured ACL or meniscal tear and released plaintiff to full duty work without restrictions. Dr. Perry knew plaintiff worked in a facility were mobile homes were manufactured and that plaintiff's work activities included routine climbing, standing, walking, stooping, squatting, and related activities. Dr. Perry felt plaintiff's knee was healthy enough to return to his regular job.
20. After being released by Dr. Perry, plaintiff returned to defendant-employer where he worked primarily in the electrical department. This job required plaintiff to enter and exit modular homes to hang lights, install ceiling fans and install electrical receptacles. The distance from the floor of the modular homes to the floor of the warehouse was anywhere between 18 and 22 inches, depending on the particular type of modular home plaintiff was working on at the time.
21. On August 18, 2006, plaintiff reported further injury to his right knee to defendant-employer and an incident report was completed. Plaintiff reported that he stepped the wrong way while exiting out of a house that was 19 to 20 inches off the ground and landed *Page 8 
wrong, falling to the ground. Plaintiff acknowledged experiencing increasing pain and swelling of his knee as a result of this incident.
22. Plaintiff presented to Dr. Perry on September 19, 2006 with a history that he had recently stepped out of a house and felt as if his knee may have given way. A clinical examination revealed swelling, tenderness, and looseness, which had not been present on March 8, 2006. Dr. Perry recommended another MRI arthorgram, because he was suspicious that plaintiff had re-torn his medial meniscus. Dr. Perry did not take plaintiff out of work on September 19, 2006 and plaintiff continued working with defendant-employer.
23. On October 2, 2006, plaintiff was performing electrical work on a home under assembly. He was wearing a tool belt weighing approximately 10 pounds and carrying a box of receptacles weighing approximately 20 pounds. Normally, plaintiff would have held onto the side of the house as he exited, but on this occasion, plaintiff's hands were full. As he exited the home in question, plaintiff stepped down approximately 19 to 20 inches, at which time his right knee buckled. Plaintiff also rolled his right ankle and fell hard onto the concrete floor. It was unusual for plaintiff to fall when he stepped out of a home. An incident report was completed and signed by plaintiff describing the event of October 2, 2006.
24. The carrier on the risk at the time of the August 18, 2006 and October 2, 2006 incidents was American Home Assurance Company and Broadspire was the third-party administrator.
25. On December 1, 2006, plaintiff underwent the MRI arthrogram recommended by Dr. Perry. The MRI arthrogram was paid for by defendant-carrier St. Paul Fire Marine Insurance Company, without prejudice. *Page 9 
26. Dr. Perry did not see plaintiff again after September 19, 2007 until January 24, 2007. When he saw plaintiff on January 24, 2007, no history was reported of a further injury on October 2, 2006. However, at his deposition, Dr. Perry agreed that the event on October 2, 2006 could have produced the findings shown on the MRI arthrogram performed on December 1, 2006. The arthrogram suggested a complete rupture of plaintiff's ACL graft and Dr. Perry recommended an exploratory arthroscopy to evaluate the ACL graft.
27. Dr. Perry has opined and the Full Commission finds that plaintiff is unable to work beginning October 2, 2006 due to the injury to his knee and will continue to be unable to work until plaintiff undergoes further surgery.
28. Dr. Perry testified and the Full Commission finds that the injuries plaintiff sustained on August 18 and October 2, 2006 were not the natural and direct result of his original injury on January 10, 2004. Dr. Perry explained that stepping down a distance of 19 to 20 inches was sufficient trauma in and of itself to tear a reconstructed ACL or a normal ACL. Dr. Perry further opined that, while plaintiff's injury on January 10, 2004 may have been a contributing factor to his injuries sustained on August 18 and October 2, 2006, it was not a significant contributing factor. Dr. Perry believed that the most probable cause of the condition he diagnosed on January 24, 2007 was the injuries plaintiff sustained on August 18 and October 2, 2006 occurring independently or in combination with each other. He felt the trauma of this mis-step on October 2, 2006 was the determining factor in tearing plaintiff's ACL graft.
29. Plaintiff earned $23,665.49 in 2006. Plaintiff did not earn wages between January 9, 2006 and March 9, 2006 as he was out of work pursuant to surgery on his right knee as a result of his January 10, 2004 injury by accident and was paid temporary total disability benefits by defendant-carrier St. Paul Fire Marine Insurance Company. *Page 10 
30. Plaintiff filed a Form 18 on October 4, 2006 alleging injury to his right ankle, right knee, right wrist, and right shoulder while he "was walking out of a house when his right knee gave way and he fell, striking the right side of his body on the ground and causing injury." Plaintiff listed defendant-carrier American Home Assurance Company on the Form 18.
31. Within 9 days, defendant-carrier American Home Assurance Company/Broadspire filed a Form 61 on October 13, 2006 but listed the date of injury at August 18, 2006. Defendant-carrier St. Paul Fire 
Marine Insurance Company did not file a Form 19 however, they were not listed as a carrier on the Form 18.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained an admittedly compensable injury by accident to his right knee on January 10, 2004. N.C. Gen. Stat. § 97-2(6).
2. In order for an injury to be compensable under the Workers' Compensation Act, it must be the result of an accident arising out of an in the course of employment. N.C. Gen. Stat. § 97-2(6). Plaintiff has the burden of proving that the injury complained of resulted from an injury by accident arising out of and in the course of the employment.Henry v. A.C. Lawrence Leather Co., 231 N.C. 477, 57 S.E.2d 760 (1950). Plaintiff must show that the incident constituted an interruption of the routine of work and the introduction thereby of unusual conditions likely to result in unexpected consequences. Adams v. BurlingtonIndustries, Inc., 61 N.C. App. 258, 300 S.E.2d 455 (1983). On August 18, 2006, plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer, when he *Page 11 
stepped the wrong way while exiting out of a house that was 19 to 20 inches off the ground and landed wrong, falling to the ground. N.C. Gen. Stat. § 97-2(6). On October 2, 2006, plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer when he fell while stepping a distance of approximately 10 to 20 inches from a mobile home without support and while wearing a 10-pound tool belt and while carrying a 20-pound box. N.C. Gen. Stat. § 97-2(6).
3. Assuming, arguendo, plaintiff's injury on October 2, 2006 resulted from an idiopathic weakness of his knee, which cause his knee to give way, this event would still constitute a compensable injury by accident. Where an injury is clearly attributable to an idiopathic condition of the employee, with no other factors intervening or operating to cause or contribute to this injury, no award should be made. Hollar v. MontclairFurniture Company, 48 N.C.App. 489, 269 S.E.2d 667 (1980). However, where the injury is associated with any risk attributable to the employment, compensation should be allowed, even though the employee may have suffered from an idiopathic condition which precipitated or contributed to the injury. Id. Even if plaintiff's fall on October 2, 2006 was due to an idiopathic condition, his employment, which required him to step down a distance of 19 to 20 inches without support and while wearing a 10-pound tool belt and while carrying a 20-pound box placed him at an increased risk of injury from his idiopathic condition.Id.
4. The condition diagnosed by Dr. Perry on January 20, 2007 proximately resulted from plaintiff's injury by accident on August 18, 2006, injury by accident on October 2, 2006, or a combination of both. Holley v.ACTS, Inc., 357 N.C. 228, 581 S.E.2d 750 (2003). Plaintiff's condition was not the direct and natural consequence of his injury on January 10, 2004. *Page 12 
 Heatherly v. Montgomery Components, Inc., 71 N.C.App. 377,323 S.E.2d 29 (1984), disc. review denied, 313 N.C. 329, 327 S.E.2d 890
(1985).
5. Plaintiff is entitled to reasonably necessary medical treatment incurred or to be incurred as a result of his August 18 and October 2, 2006 injuries by accident to be paid by defendant-carrier American Home Assurance/Broadspire, including the treatment recommended by Dr. Perry. N.C. Gen. Stat. §§ 97-25 and 97-25.1. To the extent defendant-carrier St. Paul Fire Marine Insurance Company paid for any of plaintiff's medical expenses related to plaintiff's August 18 and October 2, 2006 injuries by accident, defendant-carrier American Home Assurance/Broadspire shall reimburse defendant-carrier St. Paul Fire Marine Insurance Company pursuant to N.C. Gen. Stat. § 97-86.1.
6. N.C. Gen. Stat. § 97-2(5) sets forth the methods of calculating a claimant's average weekly wage, in the order that they are to be used. N.C. Gen. Stat. § 97-2(5). The first, second, third and fourth methods of determining plaintiff's average weekly wage do not produce a result that is fair and just to the parties given the fact that plaintiff did not earn any wages between January 9, 2006 and March 9, 2006 as he was out of work pursuant to surgery on his right knee as a result of his January 10, 2004 injury by accident and was paid temporary total disability benefits by defendant-carrier St. Paul Fire Marine Insurance Company. Defendant-carrier American Home Assurance/Broadspire provided a Form 22 Wage Statement for 2006. The use of the fifth method by calculating plaintiff's weekly wages from the time of his return to work on March 9, 2006 until he stopped working on October 6, 2006 is the most fair. Earlyv. Basnight, 214 N.C. 103, 198 S.E. 577 (1938). Using this method, plaintiff's correct average weekly wage is $828.31, which yields a compensation rate of $552.23 per week. N.C. Gen. Stat. § 97-2(5). Plaintiff is entitled to receive temporary total disability compensation in the amount of *Page 13 
$552.23 per week to be paid by defendant-carrier American Home Assurance/Broadspire beginning October 3, 2006 and continuing until plaintiff returns to work or until further order of the Commission. N.C. Gen. Stat. § 97-29.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to a reasonable attorney's fee herein approved, defendant-employer and defendant-carrier American Home Assurance Company/Broadspire shall pay temporary total disability compensation to plaintiff at the rate of $552.23 per week beginning October 3, 2006 and continuing until plaintiff returns to work or until further order of the Commission. All accrued compensation shall be paid in a lump sum.
2. A reasonable attorney's fee of 25% of the compensation awarded to plaintiff herein is approved and shall be deducted from sums due plaintiff and paid directly to plaintiff's counsel as follows: 25% of the accrued compensation shall be deducted and paid directly to plaintiff's counsel. Thereafter, every fourth check shall be paid directly to plaintiff's counsel.
3. Defendant-employer and defendant-carrier American Home Assurance Company/Broadspire shall pay all medical compensation incurred or to be incurred by plaintiff for treatment reasonably necessary to effect a cure, provide relief, or lessen plaintiff's disability from his injuries by accident on August 18 and October 2, 2006.
4. Defendant-employer and defendant-carrier American Home Assurance Company/Broadspire shall pay the costs, including, if not already paid, the expert witness fee for Dr. Perry previously approved by the Commission. *Page 14 
 ORDER
IT IS HEREBY ORDERED, pursuant to N.C. Gen. Stat. § 97-86.1(b), that defendant-employer and defendant-carrier American Home Assurance Company/Broadspire shall pay plaintiff temporary total disability benefits and medical compensation herein awarded regardless of any appeal taken from this Opinion and Award. If defendant-employer and defendant-carrier American Home Assurance Company/Broadspire are ultimately held not liable for the amount they have paid under the provisions of this Opinion and Award, they shall be reimbursed by the carrier ultimately held liable.
This the 17th day of July 2008.
 S/___________________
 DIANNE C. SELLERS
 COMMISSIONER
CONCURRING:
S/_____________ BERNADINE S. BALLANCE COMMISSIONER
S/_____________ LAURA KRANIFELD MAVRETIC COMMISSIONER *Page 1